## HAZLETON and others v. MANHATTAN INS. Co.

*(District Court, N. D. Illinois. April 24, 1882.)*

1. GENERAL AVERAGE—JETTISON—CONTRIBUTION BY INSURER.

Where the libellants show that the cargo put on deck was properly stowed, and the respondent, who was the insurer of the hull, offered no proof to show that it could have been stowed in any better or safer manner there, he is liable to contribution on general average for a necessary jettison of such deck load.

2. UNDERWRITER ON HULL—LIABLE TO CONTRIBUTION—CUSTOM AND USAGE.

The underwriter upon the hull is liable to contribute to general average for jettison of the deck load when the custom or usage of the trade in which the vessel is employed is to carry part of her cargo on deck.

3. INSURANCE—CONTRACT CONSTRUED—USAGES OF TRADE.

Where the insurance was for the season, the policy running as a marine risk, and the vessel was to be employed in the freight and passenger business, it is a necessarily-implied part of the contract of insurance that in the conduct of her business she would conform to the usages of the trade in which she was engaged; and it being clear that it was an established usage to carry part of a cargo like that in question upon deck, and that it was deemed not only conven·· ient but prudent to do so, the court must assume that the underwriter intended or contemplated that part of a cargo like that in question would be stowed · on deck, and that he assumed all the dangers and advantages of such usage.

4. SAME—PROVISION FOR ADJUSTMENT.

Where the policy provides that it is "subject to the usages and regulations of the ports of New York on all matters of adjustment and settlement of losses not herein otherwise clearly specified and provided for, to be stated by a competent adjuster of marine losses designated by the insurers," it is to be construed only to refer to the manner of making adjustment when liability exists, and does not control the question of the extent of the liability of the underwriter upon his contract; and where the underwriter had ample notice of the loss, and neglected or refused to designate an adjuster, he cannot object that the adjuster who made the general average was not designated by the company.

*Schuyler & Kremer*, for libellant.

*Rae & Smith*, for respondent.

BLODGETT, D. J. This is a libel by the owners of the schooner Melvina against the respondent, as underwriter on the hull of the schooner, for a general average claim by reason of the jettison of a quantity of pig iron from the deck of the schooner.

The material facts as they appear in the record are:

That on the eighth of November, 1880, the schooner Melvina took on board at Elk Rapids, Michigan, a cargo of pig iron for the port of Chicago, about 406 tons of which was stowed under deck, and about 61 tons, with the consent and knowledge of the shipper, was stowed on deck. The schooner was in all respects sea-worthy and properly manned when she commenced her voyage from Elk Rapids for Chicago. The weather was stormy and cold, and she was compelled to take refuge for several days in the harbor of Ludington, and while there snow and sleet fell almost continually. On the twenty-third of November she left Ludington in a sea-worthy condition, and properly manned, in prosecution of her voyage to Chicago. During the night of the 23d it became very cold, and a severe wind and snow storm set in, and the vessel became loaded with ice. The tiers of iron piled along the deck were drifted full of snow and ice, so that the water which came on board did not run off freely through the scuppers, and the vessel was in danger of foundering; and to save the lives of her crew, the vessel, and her cargo below deck, her deck load was jettisoned. Thus relieved the schooner rode out the storm in safety, and made her port of destination with the remainder of the cargo, where due protest and notice for general average was made.

The Manhattan Insurance Company, respondent in this case, had issued a policy upon the hull, tackle, apparel, and furniture of the schooner for the sum

of $3,000, insuring the schooner against the perils of navigation, jettison, etc., which policy was then in force; and the amount charged against this policy by the adjuster in making the general average was $293.39, which the respondent, after due notice and demand, refused to pay.

The proof also shows without contradiction that it is usual and customary for vessels engaged in carrying pig iron on these lakes to stow a portion of the cargo on deck, for the reason that it " makes the vessel work easier in the sea and without straining;" the proof tending to show that where the entire cargo consists of iron about 15 per cent. is loaded on deck. The proof also shows, and without contradiction, that the iron in question was properly stowed upon the deck, being piled in tiers next the bulwarks.

The respondent denies its liability—*First*, because the peril which made the jettison necessary was occasioned by the choking of the scuppers by snow and ice which gathered on and among the iron by reason of its improper stowage; *second*, because the insurer of the hull is not liable to general average for a jettison of the deck load; *third*, because the policy provides that "in case of loss the adjustment shall be made according to the usage and rules of the ports of New York, and by an experienced adjuster to be selected by the underwriter;" and it is admitted, by stipulation filed in this case, that by the usage of underwriters of the port of New York "the loss of a deck load would not be adjusted as a general average loss."

As to the first of these points it is sufficient to say that the libellant's proof shows that the cargo put on deck was properly stowed on deck, and the respondent has offered no proof to show that it could have been stowed in any better or safer manner there. The validity of this objection, it seems to me, must depend on whether the iron was rightfully stowed at all on deck. If it was rightfully there, the proof seems to show that it was properly placed; that is, it is not shown to have been in a wrong or improper place on deck. The proof does not show that it was alone the clogging of the scuppers by snow and ice among the iron that had weighted the vessel down, so that she would not rise to the sea, and was in danger of foundering, but her whole rigging and hull were loaded with ice as well as her deck. It is likely that the closing of the scuppers increased the accumulation of ice; but I conclude from the proof that if the scuppers had been free there would still have been a large quantity of ice on the vessel, and a necessity for throwing off the deck load to save her from foundering. Indeed, from the proof I think it probable that it was fortunate for all on board of this vessel, and all interested in her hull and cargo, that she had a portion of her cargo on deck, where it could be promptly jettisoned, and that had the whole cargo been below deck the vessel would probably have foundered before enough of the cargo could have been got overboard to relieve her.

As to the second point, that the insurer of the hull is not liable to general average for a jettison of deck load, the question has been so ably and thoroughly examined and discussed, in the light of the authorities in the report of the commissioner, that I do not deem it necessary to do more than state that I concur in his conclusions. It is true, there would seem at the first glance to be some conflict of authority upon this point, but after a careful examination of the cases cited by the commissioner, and by the proctors in their briefs, I think the rule fairly deducible from the modern cases is that the underwriter upon the hull is liable to contribute to general average for jettison of the deck load, when the custom or usage of the trade in which the vessel is employed is to carry part of her cargo on deck.

In 1 Parsons, Shipp. & Adm. 354, it is said:

"The rule that the jettison of goods carried on deck gives no claim for contribution, is founded upon the reason that they ought not to be there. Whenever it is proper to carry the goods on deck it might seem to be proper that the voluntary sacrifice of them should be contributed for. The propriety of so carrying them should be determined in any case, we think, by custom."

On page 356 of the same work the author says:

"We apprehend the rule should be that whenever, from the peculiar nature of the goods or of the voyage, or, in fact, for any reason, a custom exists to carry goods on deck, and this custom was well established and known, it would bind all the parties interested."

The insurance in this case was for the season, the policy running as a marine risk from the first of April to November 30th; and the schooner was to be employed in the freight and passenger business in the waters, bays, harbors, rivers, canals, and other tributaries of Lakes Superior, Michigan, St. Clair, Erie, and Ontario. It is a necessarily-implied part of this contract of insurance that, in the conduct of her business, she would conform to the usages of the trade in which she was engaged.

In *Pelly* v. *Royal Exchange Ass'n Co.* 1 Burr. 341, Lord Mansfield said:

"The insurer, in estimating the price at which he is willing to indemnify the trader against all risks, must have under his consideration the nature of the voyage to be performed, and the usual course and manner of doing it. Everything done in the usual course must have been foreseen and in contemplation at the time he engaged. He took the risk upon the supposition that what was usual or necessary would be done. * * * And in general what is usually done by such a ship with such a cargo in such a voyage is understood to be referred to by every policy, and to make a part of it as much as if it was expressed."

It being clear, then, that it was an established usage to carry part of a cargo like this upon deck, and that it was deemed not only convenient but prudent to do so, the court must assume that this underwriter intended or contemplated that part of a cargo like this would be stowed on deck, and assumed all the dangers and advantages of such usage.

It is urged by the learned proctors for the respondent that the usage must not only extend to the carrying of cargo on deck, but also a custom of the underwriters to contribute by general average for a cargo so carried must be established. But I do not think the custom of the underwriters to pay can be considered as in any respect controlling or modifying the rule as laid down. The underwriter must adjust himself to the custom of the trade which he insures, and the mere fact that the underwriter refuses to pay can have no bearing upon the question of his obligation and liability. He insures the vessel to engage in the trade in which she is to be employed according to the usual methods in which that trade is conducted, and must be presumed to have understood and contemplated the ordinary usages of loading and stowing cargo.

As to the third point, that the respondent is not liable because the policy provides that it is "subject to the usages and regulations of the ports of New York on all matters of adjustment and settlement of losses not herein otherwise clearly specified and provided for, to be stated by a competent adjuster of marine losses designated by the insurers." By a stipulation filed in the case it is admitted that according to the usage of the port of New York the loss of a deck load would not be adjusted as a general average loss. This clause I construe only to refer to the manner of making the adjustment when a liability exists, or is admitted, and does not control the question of the extent of the liability of the underwriter upon his contract.

This clause does not inject into this contract the usage of the port of New York as to the liability of the insurer to contribute for jettison of deck load, for that must be settled by the usage of the trade in which the ship insured was to be employed; but the office of this clause is to make the rule of distributing the loss among those liable to a general average contribution such as is used in the "ports of New York," which I think includes not alone the port of New York city, but all the ports of the state of New York, including Buffalo and Oswego and other lake ports, as well as New York city.

The extent of the underwriter's liability on this policy is a question of law under the facts, and is not to be settled by the rules of adjustment in any particular locality. So, too, as to the suggestion that the underwriter had the right to name the adjuster to make this general average adjustment. The proof shows that the respondents had ample notice of the loss, and if they had claimed the right to appoint or select an adjuster, we must presume it would have been conceded to them; but they having neglected or refused to designate an adjuster, this objection, that the adjuster who made the general average was not designated by them, comes to late.

I conclude, then, from the authorities which I have examined and the facts in the case, that there can be no doubt of the liability of this respondent to contribute upon this general average account. The jettison was made for the interest of all concerned. There can be no doubt under the proof that by this jettison the hull upon which this policy rested, and the remainder of the cargo, as well as the lives of the crew, were saved; and I can see no reason why those who are interested in the hull as underwriters should not contribute their *pro rata* towards paying for a proper sacrifice for the common good.

There is a further view of this case which it seems to me may help us by illustration in arriving at a correct conclusion. The policy provides that the underwriter "shall not be liable in cases of loss or damage by reason of the incompetency of the master or insufficiency of the crew, or want of due care and skill in navigating the vessel, and in *loading, stowing, and securing the cargo of the vessel;*" it being an established or conceded fact that stowage of a portion of a cargo of this kind on deck is necessary or prudent for the purpose of securing the easy and safe management of the vessel. Suppose this entire cargo had been stowed below deck and a total loss had occurred in the storm when this jettison was made, could not these respondents have successfully resisted payment upon its policy on the ground that due skill and ordinary care had not been used in the stowing of the cargo, and that as a measure of safety a portion of this cargo should have been stowed upon the deck, both for the reason that it balanced or trimmed the vessel so as to make her sail better and ride the seas easier, and the further fact that a jettison, if necessary, could be more promptly made?

It seems to me, at least, if this cargo had all been stowed below decks, and the vessel had been lost, it is more than probable that the payment of the policy would have been resisted, and perhaps successfully, upon the ground of improper stowage.